UNITED STATES of America, Plaintiff-Appellee,

v.

Gilberto ARBELAEZ, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Ralph ROJAS, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Eduardo GARRIDO PONCE de LEON, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Eduardo ARCILA, Defendant-Appellant.

Nos. 82–1084, 82–1085, 82–1115 and 82–1116.

United States Court of Appeals, Ninth Circuit.

Argued May 11, 1983.

Submitted June 14, 1983.

Decided Nov. 10, 1983.

Mervyn Hamburg, Washington, D.C., for plaintiff-appellee.

Arthur Addess, Arthur W. Tifford, Miami, Fla., Jeffrey J. Gale, Sacramento, Cal., Edward McHale, Coral Gables, Fla., for defendants-appellants.

Before PECK,* FLETCHER, and PREGERSON, Circuit Judges.

PREGERSON, Circuit Judge:

Appellants Gilberto Arbelaez, Ralph Rojas, Eduardo Garrido Ponce de Leon (Garrido), and Eduardo Arcila appeal their convictions for cocaine related offenses. After a

* Honorable John W. Peck, Senior Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

joint trial, the jury convicted all four appellants, Arbelaez, Rojas, Garrido, and Arcila, of conspiracy to possess cocaine with intent to distribute. Arbelaez, Garrido, and Arcila were also convicted of substantive counts relating to the distribution of cocaine. Rojas was acquitted of the substantive counts against him. Each appeals. We affirm.

The evidence, viewed in a light most favorable to the government, showed that in late October or early November 1980, Alfonso Beron flew to Colombia to negotiate with Carlos Arcila for 1½ kilograms of cocaine to be imported into the United States. Beron succeeded in importing the cocaine, began selling it through middleman James Shipman, and then returned to Columbia to pay Carlos Arcila. During this second trip, Arcila told Beron that in future transactions instead of flying to Colombia he could deal in Miami with Arcila's brother, appellant Eduardo Arcila.

While at the airport in Cali, Colombia, awaiting a return flight to Miami, Beron encountered appellant Eduardo Garrido, a previous acquaintance, and the two flew back to Miami together. Garrido told Beron that he knew of Beron's cocaine dealings with the Arcilas and invited Beron to deal with him.[1] Thereafter, Beron and Garrido negotiated the sale of five kilograms of cocaine. Beron was told by Garrido that his supplier was appellant Ralph Rojas. Garrido requested that Beron pay a $100,000 advance to be used to reimburse Rojas for transportation costs. Although Beron refused to advance that sum, the sale was consummated nevertheless.

Soon after negotiating the deal with Garrido, Beron and Shipman met with Eduardo Arcila in Miami and arranged purchases of cocaine from him. Eduardo Arcila promised that he would not pressure Beron for payments as Garrido had repeatedly done, so long as Beron paid weekly. Arcila's price for cocaine was $2,000 less per kilogram than Garrido's.

When Eduardo Arcila temporarily lost his supply of cocaine, Beron dealt again with Garrido. As part of these transactions, Beron gave Garrido advances to pay Rojas for transporting the cocaine from Colombia to Miami.

Beron testified that on the evening of February 13, 1981, he went to Garrido's apartment in Miami where he met Rojas and appellant Gilberto Arbelaez. In the presence of Rojas, Beron handed Garrido $250,000 in a bag. Garrido thanked Beron, but reminded him that a balance was still due. Garrido placed the money in a suitcase. Rojas then gave Garrido the keys to Rojas' car and directed him to put the money in the vehicle. In the presence of Rojas and Beron, Garrido told Arbelaez that Beron had just brought him $250,000 to pay for cocaine purchases.

That same evening, Garrido said that he wanted to show Beron something, but they would have to take a ride to see it. At about 11:00 p.m., Rojas, Garrido, Beron, and Arbelaez drove in a four-door sedan to a warehouse. The warehouse door was locked. A guard approached the car, looked inside, and returned to the warehouse to unlock it. The door to the warehouse opened and the car drove inside the structure. Garrido and Beron got out of the car. Rojas and Arbelaez remained in the vehicle. While in the warehouse, Garrido and Beron viewed numerous duffle bags. At that time Garrido told Beron that the bags contained more than 2,000 kilograms of cocaine. Garrido opened two of the bags and Beron saw cocaine. Some of it was packed in soccer-ball-shaped containers, similar to those Beron saw at Garrido's apartment, and some cocaine was in brick-type containers similar to those Beron obtained from Eduardo Arcila. Garrido and Beron then returned to the car and rejoined the others. While the four were in the vehicle returning to Garrido's apartment, Garrido told Beron that he could earn millions of dollars from the sale of cocaine.

Garrido continued to supply Beron with cocaine obtained from Arbelaez and Rojas.

---

1. When he first approached Beron, Garrido requested that Beron deal exclusively with him, but Beron did not agree to an exclusive arrangement. This evidence shows that Garrido knew he was joining others in supplying Beron with cocaine for distribution.

At times Arbelaez was present at meetings between Beron and Garrido. At one meeting, Arbelaez and Garrido both proposed that Arbelaez would supply Beron with fifteen kilograms of cocaine weekly if Shipman was not part of the deal. When Beron refused to exclude Shipman, Arbelaez withdrew his offer. The day after this meeting, Arbelaez asked Beron to work with him, but without Garrido's knowledge.

Several days later, Beron and his girlfriend Tina Brown quarreled and she summoned the police to Beron's apartment. Beron quickly informed Shipman of Brown's action and Beron and Shipman moved to a hotel. While at the hotel, Beron continued to buy and sell cocaine. He obtained three kilograms of cocaine from Arbelaez and flew to Sacramento to sell them to customers.

The following day, March 13, Beron was arrested. At the time of his arrest, Drug Enforcement Administration (DEA) agents seized two kilograms of cocaine and Beron's ledger, in which he recorded receipts and payments. Shortly after his arrest, Beron agreed to cooperate with law enforcement authorities.

For the next two months, Beron made telephone calls—recorded and monitored by DEA agents—to Arbelaez, Garrido, and others not parties to this appeal. Under surveillance Beron flew to Miami where he met Garrido, Arbelaez, and Arcila. Still under surveillance, Beron flew to California to pick up $100,000 from Shipman. Although the $100,000 was from the sale of Garrido's cocaine, Beron paid the money to Arbelaez as partial payment for cocaine obtained from him. At the request of DEA agents, Beron asked Garrido to come to Sacramento and collect money owed him. Once in Sacramento, he was arrested. Arcila then met with Beron in Anaheim to collect money he was owed and he was arrested. Subsequently, Arbelaez and Rojas were arrested in Miami.

Appellants were charged with conspiracy to possess cocaine with intent to distribute, possession of cocaine with intent to distrib-

ute and distribution of cocaine, and unlawful use of a telephone to facilitate a conspiracy to possess cocaine with intent to distribute the substance, in violation of 21 U.S.C. §§ 841(a)(1), 843(b) & 846 (1976). Following a jury trial, all appellants were convicted of conspiracy to possess cocaine with intent to distribute. Arbelaez, Garrido, and Arcila were also convicted of possession of cocaine with intent to distribute and distribution of cocaine. In addition, Garrido was convicted on one telephone count.

We now address a variety of issues raised by appellants in this consolidated appeal.

(1) *Was the evidence sufficient to convict defendants of conspiracy and related substantive charges?*

(a) *Conspiracy*

Appellants contend that the government did not prove a single overall conspiracy as set forth in the indictment, but instead proved multiple conspiracies resulting in a variance between the terms of the indictment and the proof at trial. In the instant case, our role is to view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found a single conspiracy beyond a reasonable doubt.[2] *United States v. Fleishman,* 684 F.2d 1329, 1340 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982).

To establish the existence of a single conspiracy, as compared to multiple conspiracies, the basic "test is whether there was 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy." *United States v. Zemek,* 634 F.2d 1159, 1167 (9th Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 1031, 69 L.Ed.2d 406 *and* 450 U.S. 916, 985, 101 S.Ct. 1359, 1525, 67 L.Ed.2d 341, 821 (1981). Moreover, the "general test also comprehends the existence of subgroups or subagreements." *Zemek,* 634 F.2d at 1167. We have also said that "[t]he evidence need not be such that it excludes every hypothesis but that of a

**2.** The court properly instructed the jury that it had to find that each defendant participated in the same, single conspiracy charged in the indictment.

single conspiracy; rather it is enough that the evidence adequately support a finding that a single conspiracy exists." *United States v. Kenny,* 645 F.2d 1323, 1335 (9th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981), *cited in United States v. Mastelotto,* 717 F.2d 1238, 1246 (9th Cir.1983) (petition for rehearing pending).

■ To determine whether the evidence supports the existence of one overall criminal venture, relevant areas of inquiry include "the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of times and goals." *Zemek,* 634 F.2d at 1168; *see, e.g., United States v. Baxter,* 492 F.2d 150, 158 (9th Cir.1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974) (jury may find one overall scheme if each defendant "knew or had reason to know, that other retailers were involved ... in a broad project for the smuggling, distribution and retail sale of narcotics, and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture ....").

■ After reviewing the record, we conclude that there was substantial evidence from which a rational juror could have concluded that appellants engaged in a single overall conspiracy, and therefore that there was no material variance between the proof at trial and the indictment.

*Nature of the scheme:* Appellants were engaged in the business of distributing cocaine for profit. Under the overall scheme, cocaine was imported from outside the United States, distributed to salespersons, and money was then paid to appellants from the proceeds of the sale of the cocaine.

*Identity of the participants:* Beron acted as the center of activity. He had a network of distributors selling whatever cocaine he was able to obtain from various suppliers. All appellants supplied Beron directly or indirectly with cocaine. Arcila, Garrido, and Arbelaez dealt directly with Beron.

Rojas, and sometimes Arbelaez, supplied Beron through Garrido.

*Quality, frequency, and duration of each conspirator's transactions:* The evidence indicates that each appellant was heavily involved in the criminal enterprise. Arcila and Garrido supplied cocaine whenever they could, in amounts as large as they had on hand, so long as they believed Beron could distribute the drugs. Arbelaez sold cocaine to Garrido, and, in an apparent attempt to increase his profits, offered to sell directly to Beron. While Rojas may have supplied other dealers, he was frequently involved with Garrido, constantly supplying him and pressuring him for payments for the cocaine. In addition, Rojas even offered to supply Arcila, his purported competitor.[3]

*Commonality of time and goals:* All appellants were interested in distributing as much cocaine as possible to earn as much profit as possible. To achieve this goal, all were interested in being part of a distribution network that could distribute large amounts of cocaine. Appellants were part of the illegal enterprise that centered on Beron at the same time, some being more active than others, depending on their ability at any given moment to supply the cocaine.

Our review of the evidence in light of the areas of inquiry stressed in *Zemek* therefore reveals that a reasonable jury could have concluded that there was one overall conspiracy.

■ Appellants next contend that they were not members of the conspiracy. The evidence, however, does not support their assertions. Once the government has established that a conspiracy exists, "evidence of only a slight connection is necessary to convict a defendant of knowing participation in it." *Kenny,* 645 F.2d at 1335. Moreover,

[t]he government need not show direct contact or explicit agreement between the defendants. It is sufficient to show

---

3. On one occasion, Rojas, Garrido's supplier, asked Eduardo Arcila to sell cocaine for him, but Arcila declined because the quality of the cocaine was inferior.

that each defendant knew or had reason to know of the scope of the conspiracy and that each defendant had reason to believe that [his] own benefits were dependent upon the success of the entire venture.

*United States v. Kostoff,* 585 F.2d 378, 380 (9th Cir.1978); *see also United States v. Baxter,* 492 F.2d 150 (9th Cir.1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974).

█ All the appellants were involved in supplying Beron with cocaine, either directly or indirectly. They all knew of each other's participation in the illegal enterprise and benefited from it. For example, Garrido learned of Beron's willingness and ability to distribute cocaine because he knew that the Arcilas sold cocaine to Beron. Arbelaez was introduced to Beron through Garrido with the intention that Arbelaez would supply Beron with an additional fifteen kilograms of cocaine weekly. Rojas also met Beron through Garrido. Rojas knew that some of the cocaine Beron was distributing was cocaine Rojas had sold to Garrido. Arcila also knew that Beron was selling cocaine obtained from Garrido. Thus, each appellant knew that the others were selling Beron cocaine.

Each appellant benefited from the other appellants' participation in the illegal enterprise. The appellants depended on a functioning distribution network that could sell their cocaine whenever they had a supply. To maintain such a network, Beron needed a reliable supply of cocaine. When, for example, Arcila could not supply cocaine, Beron turned to Garrido or Arbelaez. Without several suppliers, Beron would not have had a steady supply of cocaine and his distributors would eventually have dispersed to work with other dealers who had cocaine. The fact that appellants may have competed with each other for Beron's patronage did not make them any less interested in maintaining the overall distribution network.

Having thoroughly reviewed the record, we conclude that the evidence viewed in a light most favorable to the government was sufficient for a rational juror to find be-

yond a reasonable doubt that there was a single overall conspiracy centering on Beron and that each appellant was a member of that conspiracy.

(b) *Substantive counts*

█ Arcila, Arbelaez, and Garrido were each convicted of two substantive counts involving Beron's possession of cocaine in California. "[I]t is settled law that a coconspirator is liable for substantive offenses committed in furtherance of the conspiracy in which he does not actually participate." *United States v. Miranda-Uriarte,* 649 F.2d 1345, 1353 (9th Cir.1981). Once the conspiracy was proved, there was sufficient evidence to convict the defendants of the substantive charges.

(2) *Did the district court err in admitting into evidence declarations of coconspirators?*

█ Under Fed.R.Evid. 801(d)(2)(E), statements by a coconspirator made during and in furtherance of the conspiracy may be offered against a party. Appellants argue that Rule 801 is inapplicable because the government proved multiple conspiracies and thus the so-called coconspirator statements were actually hearsay. Because we have concluded that the government proved a single conspiracy, appellants' argument is without foundation and therefore Rule 801(d)(2)(E) applies. Moreover, because the evidence also shows that the statements were made during and in furtherance of the conspiracy, we conclude that the district court properly admitted the coconspirator statements. *See United States v. Mason,* 658 F.2d 1263, 1269–70 (9th Cir.1981).

█ Rojas also argues that the use of coconspirator statements violated his Sixth Amendment right to confront the witnesses against him. This court concluded in *United States v. Perez,* 658 F.2d 654, 660 (9th Cir.1981), that "[a]dmission under the coconspirator exception does not automatically guarantee compliance with the confrontation clause." We apply a two-part test to confrontation clause issues.

First ... the prosecution must ... demonstrate the unavailability of the declarant ....

The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the fact-finding process by ensuring the defendant an effective means to test adverse evidence, the clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason of the general rule."

*Id.* at 660–61, *quoting Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980).

 Rojas's codefendants were unavailable in the instant case because they did not voluntarily take the stand and under the Fifth Amendment they could not be forced to testify. We find that the circumstances under which the declarations were made were reliable because they were made as part of an on-going transaction in which the declarant had personal knowledge of the identity of the participants. *See Perez,* 658 F.2d at 661–62. Thus, we conclude that the use of coconspirator declarations did not violate Rojas's Sixth Amendment rights.

(3) *Did the court err in not conducting a pretrial hearing on the admissibility of coconspirator declarations?*

 Appellants contend that they were entitled to a *pretrial* hearing on the admissibility of coconspirator declarations. The trial judge, however, determines the order in which parties adduce proof. *Geders v. United States,* 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976); Fed.R.Evid. 611(a). It was therefore not an abuse of discretion for the court to allow the government to introduce coconspirator statements prior to establishing prima facie the existence of a conspiracy. *See Kenny,* 645 F.2d at 1333–34.

(4) *Did the court abuse its discretion when it denied Rojas's motion to sever his trial from that of his codefendants?*

 Rojas moved to sever his trial from that of his codefendants. A motion to

sever must be timely made and maintained, or the motion will be deemed waived. *United States v. Kaplan,* 554 F.2d 958, 965–66 (9th Cir.), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977). In the instant case, Rojas did not perfect his motion in a timely fashion or pursue it diligently. For example, although Rojas asserted that codefendants would present exculpatory testimony at a separate trial, Rojas never furnished the court with any representations from codefendants' counsel either confirming their client's willingness to take the stand and/or describing the nature of the exculpatory testimony.

Moreover, Rojas has failed to show that the court abused its discretion in denying his motion. A joint trial here was not "so prejudicial that the trial judge could exercise his discretion in only one way." *United States v. Escalante,* 637 F.2d 1197, 1201 (9th Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980).

In *Escalante* we said that "[t]he party seeking reversal of a decision denying severance ... has the burden of proving 'clear,' 'manifest,' or 'undue' prejudice from the joint trial." *Id.* at 1201. The defendant must prove that the prejudice was of such magnitude that he was denied a fair trial. *Id.* at 1201. Applying this test, we conclude that the court did not abuse its discretion in denying Rojas's motion to sever, and Rojas has shown no prejudice resulting from the denial of his motion.

(5) *Was the government's employment of an interpreter previously employed by Garrido grounds for dismissal of his indictment?*

After Garrido was arrested, he hired Susan Ianziti as an interpreter to assist him in his meetings with defense counsel. Ianziti worked a total of five hours for Garrido and completed her services on May 27. On June 5, DEA agents hired Ianziti to translate taped conversations in which Garrido was a party. When the agents discovered that Ianziti had been employed by Garrido, her services were terminated immediately.

Garrido asserts that upon learning that the DEA had employed Ianziti, he became suspicious of interpreters and thereafter could not talk freely with his counsel. He also asserts that the government obtained an unfair advantage by employing his former interpreter.

■ Garrido has failed to show that the government committed any misconduct or that he has suffered any prejudice from the DEA's employment of Ianziti as an interpreter. *See United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981). The court, therefore, did not err when it denied the motion to dismiss the charges alleged against Garrido in the indictment.

(6) *Did the government's closing argument constitute prosecutorial misconduct amounting to reversible error?*

■ During closing argument prosecutor Tommy Hawk made certain statements that Rojas characterizes as "exaggerated misrepresentations," "arguing outside the record," and "unprovoked personal attacks" on Rojas's defense counsel. After reviewing the record, we conclude that the comments contested by Rojas were within the scope of proper argument.

(7) *Did the district court commit reversible error by giving an* Allen *charge?*

The jury, after four days of deliberation, sent a note to the court stating: "We have come to a point where we can go no farther." After receiving this message, the judge reconvened the court and in the absence of the jury read the jury's note into the record. The judge then explained that he would first take any verdicts reached by the jury and would then consider giving an *Allen* instruction as to the unresolved charges. Rojas's attorney did not object to an *Allen* charge, but offered some procedural suggestions that the court declined. The court called the jury back and then determined that verdicts had been reached on the conspiracy count and on some, but not all, of the substantive counts involving Arcila, Arbelaez, and Garrido. No verdict had been reached on any charge involving Rojas. The court then directed the jury to deliberate further on the conspiracy and substantive counts involving Rojas and gave an *Allen* charge. At that time, Rojas's counsel, for the record, objected on the ground that the circumstances in the case did not merit the charge.

■ On appeal, Rojas contends that the trial court committed reversible error by giving the charge. The contention is without merit. This court, on numerous occasions, has approved the trial judge's decision to give an *Allen* charge. *See, e.g., United States v. Garner,* 663 F.2d 834, 841 (9th Cir.1981), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1750, 72 L.Ed.2d 161 (1982); *United States v. Armstrong,* 654 F.2d 1328, 1334–35 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1032, 71 L.Ed.2d 315 (1982); *United States v. Beattie,* 613 F.2d 762, 764 (9th Cir.), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980); *United States v. Guglielmini,* 598 F.2d 1149, 1151–53 (9th Cir.), *cert. denied,* 444 U.S. 943, 100 S.Ct. 300, 62 L.Ed.2d 310 (1979); *United States v. Seawell,* 583 F.2d 416, 418 (9th Cir.), *cert. denied,* 439 U.S. 991, 99 S.Ct. 591, 58 L.Ed.2d 666 (1978); *United States v. Moore,* 429 F.2d 1305, 1306–07 (9th Cir.1970); *Sullivan v. United States,* 414 F.2d 714, 718–19 (9th Cir.1969).

(8) *Did the district court abuse its discretion when it refused to order the posttrial deposition of a potential defense witness?*

Rojas, Garrido, and Arbelaez filed a postconviction motion to depose Gardeazabal, a citizen and resident of Colombia. Appellants allege that Gardeazabal's testimony would substantiate appellants' motion for a new trial because Gardeazabal would testify that Arbelaez was not present at Garrido's apartment on February 13, and thereby impeach Beron's trial testimony. A defendant is entitled to a new trial based on newly discovered evidence when all the requirements of Fed.R.Crim.P. 33 are met:

(1) It must appear from the motion that the evidence relied on is, in fact, newly discovered, i.e., discovered after the trial;

(2) the motion must allege facts from

which the court may infer diligence on the part of the movant; (3) the evidence relied on must not be merely cumulative or impeaching; (4) must be material to the issues involved; and (5) must be such as, on a new trial, would probably produce an acquittal.

*United States v. Diggs,* 649 F.2d 731, 739 (9th Cir.), *cert. denied,* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981).

■ The district court did not abuse its discretion when it concluded that defendants failed to meet the test for a new trial and denied their motion to depose Gardeazabal, whose evidence was known to defendants and available to them before trial. *See Kenny,* 645 F.2d at 1343–44.

The convictions are AFFIRMED.