8 F.3d 30
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Paul Richard ARNPRIESTER, Defendant-Appellant.
 No. 92-10086.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 15, 1992.
Decided Aug. 30, 1993.
 
 Before HUG, PREGERSON and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Paul Richard Arnpriester was charged with conspiracy to possess with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 846; money laundering, in violation of 18 U.S.C. 1956(a)(1)(B)(i); tampering with a witness, in violation of 18 U.S.C. § 1512(b)(3); accessory after the fact, in violation of 18 U.S.C. § 3; and making a false statement to an agency of the United States, in violation of 18 U.S.C. § 1001. Arnpriester was tried alone. The other members of the conspiracy, with the exception of Vincenzo Rocco Gianforte, pleaded guilty and testified against Arnpriester.
 
 
 3
 The jury found Arnpriester guilty of each of the charges except the tampering with a witness charge, which the district court dismissed at the close of the government's case in chief. The district court imposed the mandatory minimum sentence for the conspiracy conviction of 120 months in prison, a fine of $5,000, and 60 months probation. The district court grouped the other three counts and imposed a 120 month sentence for the group, to be served concurrently with the mandatory conspiracy sentence. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm each of Arnpriester's convictions except the conviction for a false statement to a federal agency, which we reverse. However, we remand Arnpriester's conspiracy and non-conspiracy convictions for resentencing.
 
 BACKGROUND
 
 4
 Arnpriester was part of a conspiracy to distribute methamphetamine that was headed by Kim Beckstrom. The other members of the conspiracy were Shellie Beckstrom, Douglas Walker, Vincenzo Rocco Gianforte, and Curtis Hunt. The conspiracy existed from May of 1989 until August of 1990 and sold at least 100 pounds of methamphetamine. Arnpriester did not enter the conspiracy until approximately February of 1990.
 
 
 5
 In May of 1989, the Beckstroms were arrested in Las Vegas and charged with possession of methamphetamine with intent to distribute based on a small amount of methamphetamine that was found in their car. Kim Beckstrom contacted local Las Vegas counsel to represent him and Shellie and to recover their seized vehicle. In December of 1989, the Beckstroms were arrested at their home in Phoenix. Police seized 14 grams of methamphetamine and several weapons. The Beckstroms hired Allen Bickart to represent them in the Phoenix case.
 
 
 6
 In February of 1990, Arnpriester was introduced to the Beckstroms by a friend, Chris Linton. Arnpriester, a paralegal in a Phoenix law firm, offered to help the Beckstroms in their legal difficulties in Las Vegas and Phoenix. Arnpriester drafted a complaint for the Beckstroms against Allen Bickart, seeking the return of their $17,000 retainer because they were unhappy with the attention he had given their case. Arnpriester later hid some of the money that Bickart returned to the Beckstroms in Arnpriester's wife's bank account. Arnpriester also offered to bribe government officials in Nevada and Arizona on the Beckstrom's behalf.
 
 
 7
 In May of 1990, Arnpriester began a new job with the Nissan Corporation in Los Angeles. He continued to assist the Beckstroms in Phoenix during weekend trips. In May of 1990, Arnpriester helped the Beckstroms purchase a Nissan 300ZX Turbo in Los Angeles. During the purchase, Arnpriester attempted to conceal the Beckstroms' ownership of the Nissan. Later, after the Nissan was seized at the Beckstroms' residence, Arnpriester falsely claimed, both to a DEA agent and on a petition for remission that he filed with the DEA, that the Nissan was his. Arnpriester also assisted Debbie Walsh in her legal problems and helped her avoid arrest.
 
 DISCUSSION
 
 8
 I. The Evidence was Sufficient to Support Arnpriester's Convictions.
 
 
 9
 The standard of review for sufficiency of the evidence is whether, viewing " 'the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Under this standard, we affirm each of Arnpriester's convictions.
 
 
 10
 A. Conspiracy to Distribute Methamphetamine (Count 2)
 
 
 11
 In order to prove the crime of conspiracy, the government must establish that Arnpriester agreed to distribute methamphetamine, that some member of the conspiracy took at least one overt act towards this goal, and that Arnpriester intended to further the conspiracy's distribution of methamphetamine. See United States v. Medina, 940 F.2d 1247, 1250 (9th Cir.1991); United States v. Indelicato, 800 F.2d 1482, 1483 (9th Cir.1986). Arnpriester could join the conspiracy after it was formed and be punished for all that previously had occurred in the conspiracy. See United States v. Bibbero, 749 F.2d 581, 588 (9th Cir.1984), cert. denied, 471 U.S. 1103 (1985). He is culpable if he joined the conspiracy knowing of its illegal purpose and that his benefits depended on the success of the conspiracy. See United States v. Arbelaez, 719 F.2d 1453, 1458-59 (9th Cir.1983), cert. denied, 467 U.S. 1255 (1984). Arnpriester's participation is "knowledgeable" if he knew or should have known of the conspiracy, see Arbelaez, 719 F.2d at 1459, or if he maintained deliberate ignorance. See United States v. Nicholson, 677 F.2d 706, 710 (9th Cir.1982).
 
 
 12
 To support Arnpriester's conspiracy conviction, the government presented the following evidence:
 
 
 13
 Arnpriester understood the nature of the Beckstroms' drug trade. Kim Beckstrom had showed Arnpriester some of his methamphetamine supply, discussed how successful his drug business was, and had given Arnpriester small amounts of methamphetamine for Arnpriester's personal use. Kim Beckstrom also discussed with Arnpriester moving both his auto body business and methamphetamine trade to California.
 
 
 14
 Arnpriester helped the Beckstroms conceal their assets from authorities. During an initial meeting with Kim Beckstrom, Arnpriester offered to hide one of Kim Beckstrom's cars so that the authorities would not be able to find it. Arnpriester also hid $7,000 in his wife's bank account so that the Beckstroms would have an emergency cash reserve. This was money that Arnpriester helped the Beckstroms recover from attorney Allen Bickart.
 
 
 15
 Arnpriester also helped the Beckstrom's conceal the true ownership of the Nissan they purchased in California. Kim Beckstrom testified that, after discussing ownership with Arnpriester, he intended to title the car in Arnpriester's name "to keep the government from getting it." Arnpriester filled out the paperwork for the purchase of the Nissan and had himself listed as the legal owner on the sales contract. Arnpriester also caused both the sales contract and the Currency Transaction Report that was filed to record the Beckstroms' cash payment of $29,000 to list a false address for the Beckstroms.
 
 
 16
 Further, After the Nissan, two other cars, and $21,000 cash were seized by the government from the Beckstroms' residence, Arnpriester falsely told DEA Agent Eiseman that he had loaned the Beckstroms "just about all" of the money for the Nissan. Now, however, Arnpriester claims only a $2,000 interest in the vehicle. The $2,000 he contributed to the $31,000 purchase of the Nissan, however, came from the money the Beckstrom's deposited in Arnpriester's wife's account for safekeeping.
 
 
 17
 Moreover, Arnpriester prepared and filed a petition for remission in which he falsely claimed that he had loaned his "relatives," the Beckstroms, $26,500 to purchase the Nissan. As the owner, Arnpriester claimed that the vehicle should be returned to him. Arnpriester also prepared false petitions for the Beckstroms to file for the return of the other seized cars and the $21,000 cash.
 
 
 18
 Arnpriester also offered to bribe state and federal authorities on behalf of the Beckstroms and Debbie Walsh. He also assisted Debbie Walsh in her attempts to elude authorities until the Beckstroms' Arizona drug case was resolved. Arnpriester provided Walsh a fake driver's license, arranged phone service in her apartment hide out, and offered to let her stay in his house in California so that she would be safe from arrest.
 
 
 19
 Thus, despite Arnpriester's suggestion that his involvement with the conspirators consisted of nothing more than benignly aiding them with legal, physical, and spiritual problems, substantial evidence demonstrates that Arnpriester knew of the conspiracy's purpose to sell methamphetamine and that he actively helped the conspirators hide money and assets, bribe officials, avoid capture, and fraudulently petition the DEA to have seized assets returned. For his efforts, he received at least $7,000. The jury rejected Arnpriester's innocent interpretations of his actions. Viewing the evidence in the light most favorable to the government, we conclude that a rational juror could have found beyond a reasonable doubt that Arnpriester knowingly agreed to join the conspiracy and that he knowingly received benefits from the conspiracy. See Bishop, 959 F.2d at 829. Accordingly, we affirm his conviction for conspiracy to distribute methamphetamine.
 
 B. Money Laundering (Count 6)
 
 20
 The money laundering charge is based on Arnpriester's efforts to conceal the ownership of the Nissan. Arnpriester's primary contention on appeal is that he did not conceal "the source, ownership or control of the money used to buy" the Nissan. We disagree. He correctly cites United States v. Sanders, 928 F.2d 940, 946 (10th Cir.), cert. denied, 112 S.Ct. 142 (1991), for the proposition that § 1956(a)(1)B)(i) reaches only commercial transactions that are intended to "disguise the relationship of the item purchased [from] the person providing the proceeds." Id. However, Sanders does not help Arnpriester because Arnpriester intended to and attempted to conceal the true ownership of the Nissan.
 
 
 21
 We reject Arnpriester's contention that because Arnpriester had loaned $2,000 to the Beckstroms and therefore had a security interest in the car, listing himself as the legal owner was therefore not an attempt to conceal the true ownership of the Nissan. The government presented sufficient evidence for the jury to disbelieve that the money was a "loan" because the $2,000 check was written on an account that contained the Beckstroms' money.
 
 
 22
 Moreover, Kim Beckstrom testified that he and Arnpriester initially planned to have the car titled in Arnpriester's name alone to "keep the government from getting it." Not only was Arnpriester listed as the legal owner of the car, he also caused the sales contract and Currency Transaction Report recording Kim Beckstrom's $29,000 cash payment to contain a false address for the Beckstroms.
 
 
 23
 Further, Arnpriester continued his attempt to conceal the Beckstroms' ownership of the Nissan when he talked to Agent Eiseman on June 19, 1990. Arnpriester told him that he loaned the Beckstroms "just about all" of the money for the Nissan. Moreover, the false petitions for remission that Arnpriester prepared also indicate that Arnpriester intended to conceal the Beckstroms' ownership of the Nissan.
 
 
 24
 Therefore, we conclude that, viewed in the light most favorable to the government, a rational juror could have found beyond a reasonable doubt that Arnpriester intentionally attempted to conceal the true ownership of Nissan. See Bishop, 959 F.2d at 829. Accordingly, we affirm his conviction for money laundering.
 
 C. Accessory After the Fact (Count 9)
 
 25
 Arnpriester's challenge of the accessory after the fact charge centers around his claim that the district court's jury instructions impermissibly amended the indictment by expanding the time frame of relevant conduct. The indictment alleges that Arnpriester was an accessory after the fact regarding Walsh "on or about May 21, 1990." In response to jury inquiries, the district court instructed the jury to consider the time period from February, 1990, to May 21, 1990. We discuss this argument in section II, infra, and conclude that the judge's instruction was appropriate. Given the expanded time period, we conclude here that the evidence before the jury was sufficient to support Arnpriester's accessory after the fact conviction.
 
 
 26
 Arnpriester is guilty as an accessory after the fact if, knowing that an offense had been committed, he received, relieved, comforted, or assisted an offender in order to hinder the offender's apprehension, trial, or punishment. See 18 U.S.C. § 3 (1988); United States v. Mills, 597 F.2d 693, 696 (9th Cir.1979). Witnesses testified that Arnpriester knew that there was a federal arrest warrant outstanding against Walsh. Further, Arnpriester suggested that Walsh remain in hiding because her testimony and cooperation would have been damaging to the Beckstroms. The jury heard testimony that Arnpriester offered to provide Walsh a false birth certificate and did provide her with a fake driver's license. Walsh also testified that while she was a fugitive, Arnpriester helped her establish phone service. Finally, she testified that Arnpriester offered to let her stay in an extra room in his house in California so that she would be safe from arrest. Based on this evidence, we conclude that a rational juror could have found beyond a reasonable doubt that Arnpriester intended to and did assist Walsh in her efforts to elude authorities. See Bishop, 959 F.2d at 829. Accordingly, we affirm his accessory after the fact conviction.
 
 
 27
 II. The District Court's Jury Instructions did not Impermissibly Amend the Charge of Acting as an Accessory After the Fact.
 
 
 28
 Arnpriester argues that it was improper for the district court to answer a question from the jury regarding the phrase "on or about" in the accessory after the fact charge by instructing the jury to consider the time period from February 22, 1990, to May 21, 1990. Arnpriester claims that this answer materially varied the accessory charge in the indictment. He is incorrect. Supplemental instructions, which are given in response to jury questions, are reviewed for an abuse of discretion. United States v. Solomon, 825 F.2d 1292, 1295 (9th Cir.1987), cert. denied, 484 U.S. 1046 (1988).
 
 
 29
 Arnpriester claims that the time specific accessory after the fact charge, Count 9, must be viewed juxtaposed to the "open ended" witness tampering charge, Count 8. Count 9 alleged that Arnpriester assisted Walsh in her efforts to avoid apprehension "on or about May 21, 1990." Count 8 alleged that he attempted to prevent Walsh from communicating with law enforcement regarding the Beckstroms' crimes from April 1, 1990, through May, 21, 1990.
 
 
 30
 The district court dismissed Count 8 at the close of the government's case in chief. The essence of Arnpriester's claim is that the court's instruction that the jury could consider events from February 22 to May 21, 1990, impermissibly varied the indictment because the "on or about May 21, 1990" language of Count 9 limited the jury's inquiry to evidence that happened within one or two days of May 21, 1990. Arnpriester's view is incorrect.
 
 
 31
 Exact dates are not required in an indictment so long as the actual dates are within the statute of limitations and the defendant is not prejudiced. United States v. Kayfez, 957 F.2d 677, 678 (9th Cir.1992); United States v. Lane, 514 F.2d 22, 27 (9th Cir.1975); United States v. Austin, 448 F.2d 399, 401 (9th Cir.1971). Therefore, the time frame that the court gave the jury was proper as long as Arnpriester was not prejudiced by the supplemental instruction. Arnpriester claims prejudice because his attorney did not realize that he should inquire about the accessory charge on dates other than May 21, 1990; specifically, Arnpriester claims that his counsel was denied the opportunity to cross-examine Walsh for the time period of February 22 to May 21, 1990. We disagree.
 
 
 32
 During Walsh's testimony, Arnpriester still faced Count 8. The same facts that were necessary to support the accessory after the fact charge were also required for the tampering with a witness charge. Arnpriester did in fact cross-examine Walsh about her testimony regarding facts relating to the witness tampering count. Because Arnpriester was not prejudiced, the court's instruction as to the relevant time period was not error.
 
 
 33
 Moreover, Arnpriester's use of United States v. McCown, 711 F.2d 1441 (9th Cir.1983), is incorrect. He cites McCown for the proposition that the phrase "on or about" only opens the time frame of relevant conduct one or two days. See 711 F.2d at 1450. However, McCown was decided in a different context. McCown was a challenge to an indictment for failing to state with specificity the time that a conspiracy was operative. It was not a challenge that the indictment was subsequently materially altered. Moreover, cases subsequent to McCown have reaffirmed the rule that exact dates are not required in an indictment as long as the statute of limitations is not implicated and the defendant is not prejudiced. See e.g., Kayfez, 957 F.2d at 678. Accordingly, we conclude that the district court did not abuse its discretion in its formulation of the supplemental instruction.
 
 
 34
 III. Arnpriester's Conviction on the False Statement Charge should be Reversed Because of the "Exculpatory No" Defense.
 
 
 35
 The application of the "exculpatory no" exception to liability under 18 U.S.C. § 1001 is reviewed de novo. United States v. Equihua-Juarez, 851 F.2d 1222, 1224 (9th Cir.1988). Under the "exculpatory no" doctrine, a person may not be prosecuted under § 1001 for making a false exculpatory response to government investigators if the following elements are satisfied:
 
 
 36
 (1) the false statement must be unrelated to a claim to a privilege or a claim against the government;
 
 
 37
 (2) the declarant must be responding to inquiries initiated by a federal agency or department;
 
 
 38
 (3) the false statement must not impair the basic functions entrusted by law to the agency;
 
 
 39
 (4) the government's inquiries must not constitute a routine exercise of administrative responsibility; and
 
 
 40
 (5) a truthful answer would have incriminated the declarant.
 
 
 41
 Id.
 
 
 42
 Arnpriester clearly qualifies under elements two, three, and four. Agent Eiseman initiated the inquiry by calling Arnpriester. The alleged false statement would not impair the criminal law enforcement of the DEA because competent government investigators should anticipate that suspects will make exculpatory or false statements. See Equihua-Juarez, 851 F.2d at 1225. Further, Agent Eiseman's inquiry also was not a routine exercise of administrative responsibility because at the time of the inquiry, Arnpriester was under criminal investigation by the DEA. See Equihua-Juarez, 851 F.2d at 1225.
 
 
 43
 Arnpriester also satisfies the first element because his statement was unrelated to any claim of privilege or a claim against the government. The government argues that by claiming that he owned the vehicle, Arnpriester effectively asserted that his claim to the Nissan was superior to the government's right to seize it. Arnpriester, however, was simply answering Agent Eiseman's inquiry regarding the ownership of the car; Arnpriester was not seeking the return of the Nissan. This conversation occurred on June 19, 1990, several weeks before Arnpriester drafted the petition for remission in which he claimed that he loaned the Beckstroms $26,500 for the purchase of the Nissan and requested that the car be returned to him.
 
 
 44
 Finally, Arnpriester also qualifies under the fifth element because a truthful answer would have incriminated him. Prior to the inquiry, DEA agents had contacted the Nissan dealership that sold the car. Consequently, the DEA knew that the sales contract listed Arnpriester as the legal owner of the car. If Arnpriester answered truthfully--that he did not own the Nissan--then he would have incriminated himself because he previously had attempted to conceal the true ownership of the Nissan by signing the sales contract as the legal owner. Thus, the exculpatory no doctrine insulates Arnpriester from conviction for making a false statement. Accordingly, we reverse that conviction.[1]
 
 
 45
 IV. The District Court Erred in Determining Arnpriester's Sentence for his Conspiracy Conviction.
 
 
 46
 Count 2 of the indictment charged Arnpriester and five other defendants with conspiracy to possess with intent to distribute "more than 100 grams of methamphetamine under 21 U.S.C. § 841(a)(1)." At sentencing, the district court found that Arnpriester could not be held accountable for the 100 pounds of methamphetamine attributed to him by the government and the Presentence Report. The district court found, however, that a "reasonable inference" could be drawn to hold Arnpriester accountable for 100 grams of methamphetamine. The court further concluded that under U.S. v. Contreras, 895 F.2d 1241, 1243 (9th Cir.1990), "where there is a mandatory minimum sentence with respect to the conviction, ... the Court does not have discretion to impose less than the designated minimum 10 year sentence."
 
 
 47
 We review de novo the district court's interpretation of the Sentencing Guidelines. United States v. Blaize, 959 F.2d 850, 851 (9th Cir.), cert. denied, 112 S.Ct. 2954 (1992). We review the district court's findings of fact for clear error, and we must give due deference to the district court's application of the Guidelines to the facts. Id. We conclude that the district court erred by finding that a 10-year mandatory minimum sentence was required in this case.
 
 
 48
 The district court believed it was bound by the mandatory minimum of 21 U.S.C. § 841(b) because Arnpriester was convicted under 21 U.S.C. § 841(a). However, in United States v. Sotelo-Rivera, 931 F.2d 1317, 1319, (9th Cir.1991), cert. denied, 112 S.Ct. 1186 (1992), we made clear that the jury is responsible for determining whether the defendant is convicted of § 841(a), but the district court determines at sentencing the § 841(b) penalty to be applied. In Sotelo-Rivera, the drug quantity was included in the charge sent to the jury, just as occurred in this case. Id. at 1318. The 100-gram amount the district court discussed at sentencing in this case must have been pulled from the indictment because it is not expressly supported by any other part of the record. Under Sotelo-Rivera, the district court was in no way bound by the amount of methamphetamine alleged in the indictment. Thus, the 100-gram amount alleged in the indictment against Arnpriester does not create a floor below which the district court cannot go.[2]
 
 
 49
 Moreover, the standard of proof for the determination of drug quantity under the Guidelines is not whether a "reasonable inference" can be made, but whether a preponderance of the evidence supports the quantity. See United States v. Petty, 992 F.2d 887, 891 (9th Cir.1993); United States v. Restrepo, 946 F.2d 654, 661 (9th Cir.1991) (en banc), cert. denied, 112 S.Ct. 1564 (1992); see also United States v. Becerra, 992 F.2d 960, 967 n. 2 (9th Cir.1993) (the determination of drug quantity at sentencing under 21 U.S.C. § 841(b) is the same as the drug quantity determination under the Guidelines, which requires reasonable foreseeability and the preponderance of the evidence standard). In Restrepo, we emphasized that the preponderance of evidence standard of proof requires more than "an abstract weighing of the evidence." 946 F.2d at 661. Accordingly, the district court should have determined, by a preponderance of the evidence, the quantity of drugs that Arnpriester could have reasonably foreseen would be distributed by the conspiracy. See U.S.S.G. § 1B1.3, Commentary, Application Note 2 ("With respect to offenses involving contraband (including controlled substances), the defendant is accountable for ..., in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of [controlled substance] that were within the scope of the criminal activity that he jointly undertook."). Instead, the district court, believing it was bound by the 100 gram quantity from the indictment, summarily concluded that 100 grams was a "reasonable inference."
 
 
 50
 Accordingly, we vacate Arnpriester's conspiracy sentence and instruct the district court to recalculate the drug quantity based on the reasonably foreseeable requirement and the preponderance of the evidence standard of proof, and then determine whether any mandatory minimum sentence applies. Further, because we reverse Arnpriester's false statement conviction, his sentence for his non-conspiracy convictions should also be recalculated.
 
 
 51
 AFFIRMED in part, REVERSED in part, and REMANDED for resentencing.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Because we reverse Arnpriester's conviction for making a false statement, we do not address his argument that district court erred in instructing the jury regarding the false statement charge
 
 
 [2]
 It is the 100-gram amount that dictates the application of the 10-year mandatory minimum under 841(b): "any person who violates subsection (a) of this section shall be sentenced as follows: (1)(A) In the case of a violation of subsection (a) of this section involving ... (viii) 100 grams or more of methamphetamine, ... such person shall be sentenced to a term of imprisonment which may not be less than 10 years...."