**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Bernard Vincent MONTGOMERY,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Lloyd Raymond BUXTON,**
**Defendant–Appellant.**

**Nos. 97–30142, 97–30163.**

United States Court of Appeals,
Ninth Circuit.

Argued March 3, 1998.

Decided May 13, 1998.

As Amended on Denial of Rehearing and
Rehearing En Banc July 9, 1998.*

---

* Judge Hawkins votes to deny the suggestion for rehearing en banc, Judges Alarcon and Brewster would so recommend.

Sheryl Gordon McCloud, Seattle, Washington, for defendant-appellant Bernard Vincent Montgomery.

Brenda Grantland, Mill Valley, for defendant-appellant Lloyd Ray Buxton.

Gregory M. Shogren, Assistant United States Attorney, Yakima, Washington, for the plaintiff-appellee.

Before: ALARCON and HAWKINS, Circuit Judges, and BREWSTER,** District Judge.

ALARCON, Circuit Judge:

Bernard Vincent Montgomery ("Montgomery") was found guilty of conspiracy to manufacture methamphetamine, conspiracy to

** Honorable Rudi M. Brewster, United States District Judge for the Southern District of California, sitting by designation.

distribute methamphetamine, conspiracy to import methamphetamine, distribution of methamphetamine, and possession of ephedrine with intent to manufacture methamphetamine. Lloyd Ray Buxton ("Buxton") was found guilty of conspiracy to distribute methamphetamine.

Montgomery seeks reversal of the judgment of conviction on the following grounds:

One. The separate counts of conspiracy to manufacture methamphetamine and conspiracy to distribute methamphetamine, both charged under 21 U.S.C. § 846, violated the Double Jeopardy Clause of the United States Constitution.

Two. The in-court identification of Montgomery by a prosecution witness was impermissibly tainted by improper identification procedures.

Three. The district court failed to instruct the jury that a defendant may not be convicted for conspiring solely with a government agent.

Four. The district court failed to instruct the jury that "reasonable foreseeability" is a necessary element of *Pinkerton* liability.

Five. The district court's instructions to the jury misstated the elements of a conspiracy under 21 U.S.C. § 963 by failing to include the requirement that the Government prove an overt act in furtherance of the conspiracy.

Six. The district court's instructions to the jury misstated the knowledge requirement of the crime of conspiracy.

Seven. The district court erroneously provided the jury with transcripts of the trial testimony of material witnesses.

Eight. The district court committed prejudicial error by informing the jury that certain charges against Buxton were dismissed for lack of evidence.

Buxton joins Montgomery in his fourth, sixth, and seventh contentions. He also seeks reversal of the judgment of conviction on the following grounds:

One. The district court erred in admitting evidence of defendant's prior conviction for conspiracy to manufacture methamphetamine.

Two. There was insufficient evidence to support the conviction for conspiracy to distribute methamphetamine.

Three. The district court's general instruction on conspiracy inadequately explained to the jury that a mere buyer-seller relationship is insufficient to support a conviction for conspiracy to distribute.

For the reasons stated below, we affirm the judgments of conviction on all counts.

I

Montgomery and Buxton were indicted following an investigation by the Yakima City/County Narcotics Unit ("CCNU"), the Drug Enforcement Agency ("DEA"), and the Royal Canadian Mounted Police ("RCMP"), which began with the arrest of Joanne Blair ("Blair") on June 26, 1996. Blair was arrested by detectives of the CCNU for the sale of five ounces of methamphetamine to an undercover CCNU agent. She was offered immunity in exchange for her cooperation in the identification and apprehension of her supplier. Blair identified Montgomery as her methamphetamine source, and also implicated her boyfriend, Edwin Dale McClain ("McClain"), as a participant in an international methamphetamine manufacturing and distribution network.

Blair's information led the investigators to Montgomery's home in Chilcoot, California. A CCNU detective, acting in cooperation with the Susanville, California police department, found sixteen pounds of methamphetamine and $47,000 in cash in the trunk of a car registered to Montgomery. Montgomery's companion, Helen Farley ("Farley"), was present at the Chilcoot residence during the search. She volunteered to cooperate with the investigation. Her account corroborated Blair's statements regarding: the manufacturing operations in Oregon and Canada; the details of the cross-border transfer of methamphetamine, ephedrine, and cash; and the distribution channels in Eastern Washington and in California. Farley identified Buxton as Montgomery's distributor in Sacramento.

Blair's and Farley's statements also led investigators to a methamphetamine factory in Burns, Oregon and to two suspected manufacturing sites in Alberta, ·Canada. Evidence of recent methamphetamine production was found at all three locations. Further investigation turned up witnesses and evidence (motel receipts, telephone records, telephone messages) that corroborated Blair's and Farley's descriptions of the methamphetamine network.

Blair assisted the DEA and CCNU in implementing a reverse sting operation which resulted in the arrests of McClain and Montgomery on July 2, 1996. Buxton was apprehended in Sacramento on October 8, 1996, after a warrant was issued for his arrest. He was joined as a codefendant with Montgomery and McClain in the second superseding indictment filed September 17, 1996. Count Seven of the indictment (conspiracy to manufacture methamphetamine in a place outside of the United States with intent to import into the United States) was dismissed before trial as multiplicitous in conjunction with Count Three (conspiracy to import methamphetamine). At the close of trial, the district court dismissed Count Three against Buxton for lack of evidence. The defendants were convicted on all remaining counts.

## II

■ Montgomery contends that the separate counts of conspiracy to manufacture methamphetamine and conspiracy to distribute methamphetamine, both charged under 21 U.S.C. § 846, violate the Double Jeopardy Clause. The Double Jeopardy Clause "prohibits subdivision of a single criminal conspiracy into multiple violations of one conspiracy statute." *United States v. Bendis*, 681 F.2d 561, 563 (9th Cir.1982) (citing *Braverman v. United States*, 317 U.S. 49, 52–53, 63 S.Ct. 99, 87 L.Ed. 23 (1942)). As the Court in *Braverman* explained: "Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies...." *Braverman*, 317 U.S. at 53, 63 S.Ct. 99.

Montgomery relies on our decision in *United States v. Alerta*, 96 F.3d 1230 (9th Cir.1996), to support his contention that the Double Jeopardy Clause is violated whenever the Government charges two or .more counts of conspiracy as being under a single statute. Contrary to Montgomery's assertions, *Alerta* did not establish a rule barring the government from charging multiple conspiracy violations under·a single conspiracy statute. ·

■ In *Alerta*, the defendant was charged with conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846 and conspiracy to use firearms during and in relation to drug trafficking in violation of 18 U.S.C. § 371. *See Alerta*, 96 F.3d at 1232. The defendant contended that because there was only one underlying conspiracy, *Braverman* prohibited the Government from charging violations of both sections 846 and 371. *See id.* at 1237. In *Alerta*, we found that "as a matter of charges and of evidence" only a single conspiracy existed. *Id.* at 1237. We then applied the test developed by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to determine whether Congress, where it had created two separate offenses applying to the same multi-object conspiracy, intended separate punishments. *Alerta*, 96 F.3d at 1238–39. The *Blockburger* test requires us to examine the statutory elements of the underlying offenses. Under *Blockburger*, "Congress is deemed to have intended multiple punishments if each offense require[s] proof of a fact that the other does not." *Alerta*, 96 F.3d at 1238. We held in *Alerta* that section 846 and section 371 were "not distinct under the *Blockburger* test," and concluded that the charges against Alerta were multiplicitous. *Id.* at 1239.

■ Montgomery suggests that two conspiracy charges under the same statute must be multiplicitous because a statute cannot be distinct from itself. Montgomery's reliance on *Alerta* for this argument is misguided. Montgomery fails to appreciate the necessity of first determining whether the defendant is being charged with single or multiple con-

spiracies.[1]

We have declined to apply the *Blockburger* double jeopardy analysis in cases where multiple conspiracies were charged, either consecutively or simultaneously, under the same conspiracy statute. *See, e.g., Bendis,* 681 F.2d at 564. In *Bendis,* we acknowledged that the "primary constitutional test used to determine whether two counts in the same or subsequent indictments charge the same offense is the 'same evidence' or 'Blockburger' test." *Id.* We noted, however, that "[p]roviding the double jeopardy protection recognized in 'Braverman' presents a peculiar problem and requires application of a *different* test." *Id.* (emphasis added).

Our concern in *Bendis* was that the *Blockburger* test, which focuses solely on the required elements of proof of the charged offenses, does not provide sufficient protection against "artful crafting of conspiracy charges which could permit the government to subdivide one criminal conspiracy into multiple violations of a single statute" in violation of the principle established in *Braverman. Bendis,* 681 F.2d at 565. In response to this concern, we adopted the "factor analysis" test in *Arnold v. United States,* 336 F.2d 347, 350 (9th Cir.1964). *See Bendis,* 681 F.2d at 565. We summarized the *Arnold* factor analysis as follows:

> [T]o determine whether two conspiracy counts charge the same offense and so place the defendant in double jeopardy, we consider five factors: (1) the differences in the periods of time covered by the alleged conspiracies; (2) the places where the conspiracies were alleged to occur; (3) the persons charged as coconspirators; (4) the overt acts alleged to have been committed; and (5) the statutes alleged to have been violated.

*United States v. Stoddard,* 111 F.3d 1450, 1454 (9th Cir.1997) (citation and internal quotation marks omitted).

The defendant has the burden of showing that the two conspiracies charged are actually based on a single agreement.

*See Bendis,* 681 F.2d at 564. *See also United States v. Guzman,* 852 F.2d 1117, 1119–20 (9th Cir.1988) (holding that defendant must show "that the two conspiracies are indistinguishable in law and in fact").

Montgomery contends that *Alerta* mandates the application of the *Blockburger* test, and that *Blockburger* requires us to compare "the elements of the two charged conspiracies, not the evidence presented." (Montgomery's Reply Br. at 3.) In focusing on the question of which test applies, Montgomery fails to offer any argument in support of the pivotal issue—whether the indictment and the evidence show the existence of multiple, distinct conspiracies or a single, multi-object conspiracy. Ultimately, Montgomery fails to demonstrate that the two conspiracies charged in the indictment are indistinguishable.

In *United States v. Kenny,* 645 F.2d 1323 (9th Cir.1981), we explained that "sufficiency of the evidence" analysis is applicable to the determination of the question whether the evidence shows the existence of a single, multi-object conspiracy or multiple, distinct conspiracies. *Id.* at 1335. Accordingly, we must examine the evidence in the light most favorable to the prosecution to determine if any rational trier of fact could have found that more than one conspiracy existed. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Kenny,* 645 F.2d at 1335. In light of the above standard, we apply the factors articulated in *Stoddard,* 111 F.3d at 1454. "[W]e do not focus on one single factor, but consider all the factors together." *Id.* at 1456–57. *See also Bendis,* 681 F.2d at 568 ("No one component of the Arnold analysis has controlling significance."). The record supports the conclusion that Montgomery was involved in two distinct conspiracies.

Time Frame: The time periods of the two conspiracies substantially overlap. The Government introduced evidence, however, that the Oregon manufacturing operation,

---

**1.** The *Alerta* decision itself recognizes the importance of this initial inquiry. We noted in *Alerta* that in *Albernaz v. United States,* 450 U.S. 333, 339–40, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), the "[Supreme] Court distinguished *Braverman* because, in *Braverman,* both purported offenses were violations of the same statute." *Alerta,* 96 F.3d at 1238.

charged in Count One, started at an earlier date than the Canadian methamphetamine distribution operation, charged in Count Two.

Geographic Location: The record demonstrates that there was little overlap in the places where the objects of the conspiracies were put into effect. The Government presented evidence showing that "low quality" methamphetamine manufactured in Oregon was distributed exclusively in Eastern Washington, and that "high quality" methamphetamine manufactured in Canada was distributed primarily in California.

Participants: Count One named Montgomery, McClain, Herbert Crawford, Robert Taylor, and others, known and unknown, as members of a conspiracy to manufacture methamphetamine in Oregon. Count Two named Montgomery, McClain, Buxton and others, known and unknown, as members of a conspiracy to distribute methamphetamine manufactured in Canada. The involvement of Montgomery and McClain in both conspiracies does not compel a finding that a single conspiracy existed. See Guzman, 852 F.2d at 1120 (focusing on the different activities of the members in each conspiracy where two conspiracies had overlapping members). We must determine whether the roles performed by the overlapping members were different in each conspiracy. See id. The Government introduced evidence through Blair and Farley that Montgomery was a methamphetamine "cook" in the Canadian distribution operation, and that McClain was the "cook" in the Oregon manufacturing operation. Montgomery provided ephedrine to McClain for the Oregon manufacturing operation, and McClain assisted Montgomery in transporting methamphetamine into the United States from Canada for distribution. Because Montgomery and McClain played different roles in each of the two conspiracies, we conclude that there was no significant overlap of participants.

Overt Acts: The conspiracies charged in Counts One and Two allege different overt acts. Count One alleges methamphetamine manufacturing in Oregon, and Count Two alleges distribution of methamphetamine produced in Canada.

Statutes Violated: When the two conspiracies charged violate the same statute, we consider "whether the goals of the two conspiracies were similar." Stoddard, 111 F.3d at 1456. Here, the goal of the conspiracy charged in Count One was the manufacture of low quality methamphetamine. The goal of the conspiracy charged in Count Two was the distribution of high quality methamphetamine. Different goals suggest the existence of two distinct conspiracies. See id. (finding that the existence of two conspiracies is indicated where one conspiracy's goal was the purchase of marijuana and the other conspiracy's goal was the growth, sale and distribution of marijuana). See also Guzman, 852 F.2d at 1121 (finding that the goal of one conspiracy to distribute cocaine differed from the goal of the other conspiracy to manufacture cocaine).

Having applied the "factor analysis" test articulated in Stoddard, we determine that the evidence in the record, examined in the light most favorable to the Government, supports the conclusion that Counts One and Two charged two distinct conspiracies. We therefore conclude that the judgment of conviction against Montgomery for the two conspiracies charged under 21 U.S.C. § 846 did not violate the Double Jeopardy Clause.

### III

■ Montgomery argues that he was deprived of his right to due process because the court admitted the in-court identification testimony of Lance Blondin ("Blondin"). Blondin, an employee of a Canadian chemical supply company, identified Montgomery at trial as the purchaser of a large quantity of red phosphorous—a key ingredient in the manufacture of methamphetamine. Montgomery contends that this in-court identification was tainted by impermissibly suggestive pretrial identification procedures employed by the Government. "Suggestive pretrial identification procedures may be so impermissibly suggestive as to taint subsequent in-court identifications and thereby deny a defendant due process of law." United States v. Bagley, 772 F.2d 482, 492 (9th Cir.1985).

We review *de novo* the constitutionality of pretrial identification procedures. *United States v. Atcheson,* 94 F.3d 1237, 1246 (9th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1096, 137 L.Ed.2d 229 (1997). "[C]onvictions based on eyewitness identification at trial following a pretrial identification ... will be set aside ... only if the [pretrial] identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. U.S.,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). "It is the likelihood of misidentification which violates a defendant's right to due process...." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Id.*

A. Were the pretrial identification procedures unnecessarily suggestive?

In August 1996, officers of the DEA and RCMP showed photos of Montgomery, Marks, and McClain to Blondin. He identified Montgomery as the person who, using the name "Jim Luna," had purchased a large quantity of red phosphorous on a rush basis. Several weeks prior to trial, Blondin requested that the DEA fax him a photograph of Montgomery, to "have it right in [his] mind that [he] could identify Montgomery." He later called an agent at the DEA to inform her that the man in the photograph was Montgomery. Blondin pinned this photograph to the wall of his office and looked at it several times prior to testifying.

The day before Blondin was scheduled to testify, he entered the courtroom with a DEA agent and looked at Montgomery, who was seated at the defense table. Blondin testified that he asked the DEA agent to bring him into the courtroom so that he could "have it straight in my mind that Montgomery was the fellow that had purchased the chemicals from us...." Montgomery asserts that the combination of identification procedures—the initial photo-identification,

the subsequent single photograph identification, and the one-on-one confrontation—was "unnecessarily suggestive and conducive to irreparable mistaken identification."

An identification procedure is suggestive when it "emphasize[s] the focus upon a single individual" thereby increasing the likelihood of misidentification. *Bagley,* 772 F.2d at 493 ("The repeated showing of the picture of an individual, for example, reinforces the image of the photograph in the mind of the viewer."); *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."). We agree with Montgomery that showing Blondin the photographs of Marks, McClain, and Montgomery, granting Blondin's request for a photograph of Montgomery, and permitting Blondin to view Montgomery in the courtroom the day before the witness was scheduled to testify, were suggestive procedures that emphasized the focus of the investigation on Montgomery as the person who purchased the red phosphorous.

The Court in *Stovall* explained that a suggestive pretrial identification procedure does not violate due process when use of the procedure is "imperative." *See Stovall,* 388 U.S. at 301–02, 87 S.Ct. 1967 (holding that a one person show-up in a hospital room of critically wounded victim did not violate due process where the record revealed that the suggestive confrontation was "imperative"). The issue before the Court in *Stovall* was whether the pretrial identification procedure was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Id.* at 301, 87 S.Ct. 1967. We read *Stovall* to mean that an identification procedure is unnecessarily suggestive when its use is not imperative.

The record in the case before us is devoid of any indication that the Government's use of the suggestive identification procedures was imperative. The initial photo identification by Blondin took place one year after the purchase of red phosphorous by Montgomery. The Government had ample time to

prepare a non-suggestive photographic array. The faxed photo identification and the in-court one-on-one confrontation were not compelled by any exigent circumstances. Accordingly, we conclude that the identification procedures employed by the Government were unnecessarily suggestive.

B. Was the in-court identification testimony sufficiently reliable under the totality of the circumstances?

 "Should we find a pretrial procedure impermissibly suggestive, automatic exclusion of identification testimony is not required." *Bagley,* 772 F.2d at 492 (citing *Manson v. Brathwaite,* 432 U.S. 98, 113–14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); and *Biggers,* 409 U.S. at 198–99, 93 S.Ct. 375). "If under the totality of the circumstances the identification is sufficiently reliable, identification testimony may properly be allowed into evidence even if the identification was made pursuant to an unnecessarily suggestive procedure." *Id.*

 The factors we consider in deciding whether in-court identification testimony is sufficiently reliable are: (1) the witness's opportunity to view the defendant at the time of the incident; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; · (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification. *See Biggers,* 409 U.S. at 199–200, 93 S.Ct. 375; *United States v. Jones,* 84 F.3d 1206, 1209–10 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 405, 136 L.Ed.2d 319 (1996). ·

Blondin had ample opportunity to view Montgomery at the time Montgomery purchased the red phosphorous. Furthermore, because the large order for a key methamphetamine ingredient raised Blondin's suspicions, he made a point of gaining a detailed description of the purchaser. This description was later recorded by Blondin and faxed to the RCMP. The district court found that this description was "accurate." One year later, when presented with photos of Marks, McClain, and Montgomery, Blondin was able

to make a positive identification of Montgomery as the purchaser.

We conclude that Blondin's in-court identification of Montgomery was sufficiently reliable as a matter of law, based on the factors set out in *Biggers.* ˙ *See* 409 U.S. at 199–200, 93 S.Ct. 375. Thus, the admission of Blondin's in-court identification testimony was not a violation of due process. The unnecessarily suggestive pretrial identification procedures did not create a "substantial likelihood of irreparable misidentification." *Simmons,* 390 U.S. at 384, 88 S.Ct. 967.

### IV

 Montgomery also contends that the fact that the DEA agent granted Blondin's request to take him to the courtroom to confirm the witness's initial photo identification of Montgomery violated his right to counsel. He argues that the right to counsel at a post-indictment lineup also applies to the eyewitness's observation of Montgomery in the courtroom the day before the witness was scheduled to testify.

Montgomery's argument can be summarized in this syllogism:

A defendant is entitled to counsel at a post-indictment lineup or show up.

The police permitted an identification witness to see Montgomery in the courtroom without notifying his attorney the day before the witness testified.

Therefore, Montgomery was deprived of his right to counsel at a critical stage of the criminal proceedings against him.

Montgomery has confused the adversarial confrontation that occurs when a defendant is compelled to participate in a police lineup or show up with the surreptitious observation of the defendant in the courtroom by an identification witness the day prior to his testimony.

 In *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 ·(1973), the Supreme Court summarized the decisions interpreting the Sixth Amendment's guarantee of a right to counsel. The Court stated that "the core purpose of the counsel guarantee was to assure 'Assistance' at trial, when the

accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor." *Id.* at 309, 93 S.Ct. 2568. The Court instructed that the right to counsel applies to the formal trial, and to "pretrial events that might appropriately be considered to be parts of the trial itself." *Id.* at 310, 93 S.Ct. 2568. "The Court consistently has applied a historical interpretation of the guarantee, and has expanded the constitutional right to counsel only when new contexts appear presenting the same dangers that gave birth initially to the right itself." *Id.* at 311, 93 S.Ct. 2568.

The Court has recognized arraignment as "a critical stage in a criminal proceeding" requiring the guiding hand of counsel to prevent a waiver of available defenses. *Hamilton v. Alabama*, 368 U.S. 52, 53, 82 S.Ct. 157. In *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), the Court held that a preliminary hearing to determine whether there is sufficient evidence to warrant presenting the accused's case to a grand jury is a critical stage of a state's criminal process because a "lawyer's skilled examination and cross-examination of witnesses may expose fatal weaknesses in the State's case that may lead the magistrate to refuse to bind the accused over." *Id.* at 9, 90 S.Ct. 1999. Additionally, the Court reasoned that "[t]he inability of the . . . accused on his own to realize these advantages of a lawyer's assistance compels the conclusion that the Alabama preliminary hearing is a 'critical stage' of the State's criminal process at which the accused is 'as much entitled to such aid [of counsel] . . . as at the trial itself.'" *Id.* at 9–10, 90 S.Ct. 1999 (quoting *Powell v. Alabama*, 287 U.S. 45, 57, 53 S.Ct. 55, 77 L.Ed. 158 (1932)).

The right to counsel was extended to police lineups in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In *Ash*, the Court explained the basis for its decision to extend the right to counsel at a lineup as follows:

> The function of counsel in rendering 'Assistance' continued at the lineup under consideration in *Wade* and its companion cases. Although the accused was not confronted there with legal questions, the lineup offered opportunities for prosecuting authorities to take advantage of the accused. Counsel was seen by the Court as being more sensitive to, and aware of, suggestive influences than the accused himself, and as better able to reconstruct the events at trial. Counsel present at lineup would be able to remove disabilities of the accused in precisely the same fashion that counsel compensated for the disabilities of the layman at trial. Thus, the Court mentioned that the accused's memory might be dimmed by 'emotional tension,' that the accused's credibility at trial would be diminished by his status as defendant, and that the accused might be unable to present his version effectively without giving up his privilege against compulsory self-incrimination. *United States v. Wade*, 388 U.S. at 230–231, 87 S.Ct. 1926. It was in order to compensate for these deficiencies that the Court found the need for the assistance of counsel.

*Ash*, 413 U.S. at 312–13, 93 S.Ct. 2568.

The Court in *Ash* held that in determining whether an accused has the right to counsel, a court must examine "the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary." *Id.* at 313, 93 S.Ct. 2568. The Court concluded that the "Assistance of Counsel" is required at any trial-like confrontation "to preserve the adversary process by compensating for advantages of the prosecuting authorities." *Id.* at 314, 93 S.Ct. 2568. *See also Moore v. Illinois*, 434 U.S. 220, 231, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977) (holding that an uncounseled identification conducted at a preliminary hearing violated the accused's Sixth Amendment right to counsel).

In *Ash*, the petitioner argued that "the Sixth Amendment grants an accused the right to have counsel present whenever the Government conducts a post-indictment photographic display, containing a picture of the accused, for the purpose of allowing a witness to attempt an identification of the offender." *Id.* at 301, 93 S.Ct. 2568. The Court declined to extend the right to counsel to this type of pretrial event because "the accused himself is not present at the time of

the photographic display and asserts no right to be present ..., [therefore] no possibility arises that the accused might be misled by his lack of familiarity with the law or overpowered by his professional adversary." *Id.* at 317, 93 S.Ct. 2568 (internal citation omitted). The Court held that "[i]f accurate reconstruction of an event is possible" by an adversary confrontation with defense counsel during trial "the risks inherent in any confrontation still remain, but the opportunity to cure defects at trial causes the [pretrial] confrontation to cease to be 'critical.' " *Id.* at 316, 93 S.Ct. 2568. The Court thus recognized a distinction between adversarial confrontations at which the accused possesses the Sixth Amendment right to counsel, and non-adversarial confrontations at which the counsel guarantee is not implicated.

 Relying on the Court's instruction in *Ash* and *Wade*, we held in *Jordan v. Ducharme*, 983 F.2d 933 (9th Cir.1993), that "[t]o determine whether a pretrial event implicates the right to counsel, a court must consider whether cross-examination can reveal any improper procedures that occur in counsel's absence." *Id.* at 937. Applying this test, we held that the appellant was not prejudiced when a police officer ordered defense counsel out of the witness preparation room while the identification witnesses were given preliminary instructions regarding the lineup procedures that followed. *Id.* at 937–38.

In *Jordan,* we rejected appellant's argument that counsel's presence is required while the police instruct identification witnesses prior to a lineup to avoid the risk of undue suggestion. We stated that this proposition "ignores the requirement that the pretrial event be a 'critical' stage where an accused may be overpowered by his professional adversary." *Id.* at 937.

Applying these principles to this matter, we conclude that the challenged event was not an adversarial confrontation. Montgomery was not confronted by a prosecutor with superior knowledge of the law. Nor was the accused placed in a position where he was threatened with a loss of an available defense because he did not have the guiding hand of counsel. Unlike a lineup where the accused

is subject to emotional tension that might affect his or her memory regarding improper police suggestions or procedures, and thereby diminish his or her credibility as a witness, Montgomery was covertly observed sitting in the courtroom by an identification witness. Montgomery's counsel was not aware of this event until he elicited this information from Blondin during cross-examination. Montgomery was not faced with the choice of giving up his privilege against compulsory self-incrimination in order to present evidence of the unnecessarily suggestive nature of this identification procedure. Montgomery's counsel effectively reconstructed this event through cross-examination of the identification witness. Rather than losing an available defense, the possibility of an identification witness's unnecessarily suggestive confrontation with the defendant presented Montgomery's attorney with strong ammunition to attack the accuracy of Blondin's identification.

Under the circumstances presented in this record, the Government's failure to notify Montgomery's counsel prior to permitting Blondin to view Montgomery in the courtroom did not deprive him of his right to counsel.

## V

Montgomery argues that the district court's failure to give a *Sears* instruction to the jury is grounds for reversal of his conviction on all counts. *See Sears v. United States,* 343 F.2d 139, 142 (5th Cir.1965). In *Sears,* the Fifth Circuit held that "there can be no indictable conspiracy with a government informer who secretly intends to frustrate the conspiracy." *Id.*

At the close of trial, McClain objected to the court's refusal to accept his proposed Instruction 1. That instruction explained that an "individual must conspire with at least one bona fide co-conspirator to meet the formal requirements of a conspiracy. There can be no conspiracy with the government informer who secretly intends to frustrate the conspiracy." McClain's request was prompted by the Government's use of telephone *records* to link McClain and Montgomery in the con-

spiracy counts. The court noted that the post-June 26 telephone *conversations* related only to Count Six—possession of ephedrine, and agreed to instruct the jury to that effect. Montgomery contends that Blair was a Government agent because during part of the investigation she was cooperating with the authorities. Montgomery argues (for the first time before this court) that the substance of the post-June 26 telephone conversations between Blair and himself could, on its own, have provided the jury with enough evidence to convict him of the conspiracies charged in Counts One, Two, and Three. Based on this argument, Montgomery contends that he was entitled to a *Sears* instruction. We disagree.

■■■ Rule 30 of the Federal Rules of Criminal Procedure states in pertinent part that:

> [A]ny party may file written requests that the court instruct the jury on the law as set forth in the requests ... No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection.

Fed.R.Crim.P. 30.

Montgomery did not request a *Sears* instruction, nor did he join in McClain's request for a similar instruction. Consequently, Montgomery "failed to preserve for appeal his challenge" to the district court's omission of an instruction concerning this theory of his case. *See United States v. Klinger,* 128 F.3d 705, 711 (9th Cir.1997) (where defendant failed to comply with Rule 30, his challenge to the district court's instructions was not preserved for appeal).

■■■ Because Montgomery failed to object to the omission of a *Sears* instruction, we review this contention for plain error. *See id.* at 711–12. Where a defendant does not offer a particular instruction, and does not rely on the theory of defense embodied in that instruction at trial, the district court's failure to offer an instruction on that theory *sua sponte* is not plain error. *See United*

*States v. Span,* 970 F.2d 573, 578 (9th Cir. 1992).

■■■ We explained in *Span* that a "district court must still decide whether the case presented at trial supports giving an instruction based on a particular theory of defense." *Id.* Montgomery did not advance the theory during trial that the evidence supported an inference that a conspiracy existed between Blair and Montgomery alone. Montgomery's theory of defense at trial was that he was not involved in any conspiracy to manufacture, distribute, or import methamphetamine. On appeal, Montgomery asks this court to consider the possibility that the jury could have disbelieved every shred of evidence presented at trial except for the contents of the post-June 26 telephone conversations, and concluded that Montgomery had conspired to manufacture, distribute, and import methamphetamine solely with Blair between June 26 and July 2, 1996. The telephone conversations do not support this theory. Montgomery concedes this point in his brief where he argues: "But what [Montgomery] did between June 26 and July 2 with Blair did not constitute the crime of conspiracy." We conclude that Montgomery did not rely on a *Sears*-type defense theory at trial. Accordingly, the district court's failure to offer a *Sears* instruction *sua sponte* was not plain error.

## VI

■■■ Montgomery and Buxton assert for the first time on appeal that the district court's failure to include the element of "reasonable foreseeability" in the *Pinkerton* instruction constitutes reversible error. *See Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) (holding defendant responsible for substantive offense committed by co-conspirator in furtherance of the conspiracy). The appellants contend that "reasonable foreseeability" language was required because the instruction as given by the district court to the jury "allowed ... conviction based on vicarious liability not just for substantive offenses, but for additional conspiracies, and hence the additional substantive offenses connected with those conspiracies." (Montgomery's

Opening Br. at 45.) Because the defendants failed to raise this issue at trial, we must review the district court's *Pinkerton* instruction for plain error. *See United States v. Fagan*, 996 F.2d 1009, 1016 (9th Cir.1993) (where defendant fails to object to jury instruction at trial, we review the instruction for plain error).

In *United States v. Moore*, 109 F.3d 1456 (9th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 108, 139 L.Ed.2d 61 (1997), we explained that allegedly confusing jury instructions are reviewed "in the context of the entire trial to determine if they were misleading or inadequate to guide the jury's deliberations." *Id.* at 1465 (quotation marks and citation omitted). Here, the district court instructed the jury on co-conspirator vicarious liability as follows:

A conspiracy is a kind of criminal partnership—an agreement between two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful....

. . . .

Each member of a conspiracy is responsible for the actions of other conspirators performed during the course and in furtherance of the conspiracy. Before you may consider the statements or acts of a co-conspirator, you must first determine whether the acts or statements were made during the existence of and in furtherance of the unlawful scheme....

Once you have decided that a defendant was a member of *the conspiracy*, that defendant is responsible for what the other conspirators said or did *to carry out the conspiracy*, even if the defendant did not know what they said or did."

(emphasis added)

■ The district court's *Pinkerton* instruction, reviewed in the context of the entire trial, was neither misleading nor an in-adequate guide for the jury. "Juries are presumed to follow the court's instructions." *Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir.1997). A jury following the instruction as given by the district court in this case could not convict a defendant of additional conspiracies on a theory of vicarious liability, but only of substantive offenses committed in furtherance of the particular conspiracy in question. Accordingly, the district court did not err in failing to include *sua sponte* the concept of reasonable foreseeability.

## VII

■ Montgomery argues that the district court erroneously instructed the jury on the elements of a conspiracy charged under 21 U.S.C. § 963. Specifically, Montgomery asserts that one of the required elements of a conspiracy charge under section 963 is the proof of an overt act in furtherance of the conspiracy.[2] We review *de novo* the question whether a jury instruction misstates the elements of a crime. *United States v. Johnson*, 956 F.2d 197, 199 (9th Cir.1992).

■ In *United States v. Shabani*, 513 U.S. 10, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994), the Supreme Court held that "[i]n order to establish a violation of 21 U.S.C. § 846, the Government need not prove the commission of any overt acts in furtherance of the conspiracy." *Id.* at 15, 115 S.Ct. 382. This decision rested on the language of section 846, which does not expressly require proof of the commission of an overt act.[3] *See id.* at 13, 115 S.Ct. 382. The Court noted that it has not "inferred [an overt act requirement] from congressional silence in other conspiracy statutes." *Id.*

The language used by Congress in section 963 and section 846 is identical. Furthermore, the two statutes were enacted at the same time as part of the same public law.[4]

---

**2.** 21 U.S.C. § 963 states: "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

**3.** 21 U.S.C. § 846 states: "Any person who attempts or conspires to commit any offense de-

fined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

**4.** In *United States v. Iriarte-Ortega*, 113 F.3d 1022 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1209, 140 L.Ed.2d 330 (1998), we noted (without deciding) that "[s]ince 21 U.S.C.

*See* Pub.L. 91–513, Title II, Section 406, Oct. 27, 1970, 84 Stat. 1265; Pub.L. 100–690, Title VI, Section 6470(a), Nov. 18, 1988, 102 Stat. 4377. Application of the reasoning of the Court in *Shabani* leads logically to the conclusion that "proof of an overt act" is not a required element of a conspiracy charge pursuant to section 963.

Montgomery contends that despite the reasoning of the Court in *Shabani*, the law of this circuit as expressed in *United States v. Kearney*, 560 F.2d 1358 (9th Cir.1977), requires that the Government prove the existence of an overt act in furtherance of a conspiracy charged under 21 U.S.C. § 963. In *Kearney*, we held that "a conspiracy conviction requires proof of an agreement and but one overt act. . . ." *Id.* at 1366. *Kearney* was decided long before the rule in *Shabani* was announced by the Court. We explained in *Le Vick v. Skaggs Cos.*, 701 F.2d 777 (9th Cir.1983), that "when existing Ninth Circuit precedent has been undermined by subsequent Supreme Court decisions, this court may reexamine that precedent without the convening of an en banc panel." *Id.* at 778. Our prior case law defining the elements of a conspiracy charged under section 963 was "undermined" by the Court's decision in *Shabani*. Accordingly, we hold that section 963 does not require proof of an overt act in furtherance of the conspiracy. The district court's jury instruction did not misstate the elements of a conspiracy charged under 21 U.S.C. § 963.

## VIII

■ Montgomery and Buxton contend for the first time on appeal that Instruction 17 erroneously contained language which allowed the jury to convict them of conspiracy based on an objective standard of knowledge. Because the defendants did not object to the instruction at trial, we review for plain error. *See Whitmore*, 24 F.3d at 34.

The language used in Instruction 17 contains an accurate restatement of this circuit's controlling precedent. *See United States v. Arbelaez*, 719 F.2d 1453, 1458 (9th Cir.1983).

In *Arbelaez*, we acknowledged that once the government proves the existence of a conspiracy, "evidence of only a slight connection is necessary to convict a defendant of knowing participation in it." *Id.* (citation and internal quotation marks omitted). Instruction 17 reads in pertinent part:

You must first decide whether the conspiracies charged in the indictment existed, and, if it [sic] did, who at least some of its members were. For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a joint plan to distribute or manufacture or import methamphetamine.

. . . .

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy, or the names, identities, or locations of all of the other members. One who willfully joins an existing conspiracy is as responsible for it as the originators.

. . . .

Even if a defendant did not directly conspire with the other conspirators in the overall scheme, the defendant has, in effect, agreed to participate in the conspiracy if it is proved beyond a reasonable doubt that:

(1) the defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy;

(2) the defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired, and

(3) the defendant had reason to know that whatever benefits the defendant might get from the conspiracy were probably depen-

---

§ 963 and § 846 have identical language and are part of the same law—the Comprehensive Drug Abuse Prevention and Control Act of 1970—it is likely that section 963 also requires no overt act." *Id.* at 1025 n. 1.

dent upon the success of the entire venture.

The objective standard of knowledge referred to in Instruction 17 relates to connecting a defendant to a conspiracy that has already been proven to exist. In fact, Instruction 17 includes a specific requirement that the government prove beyond a reasonable doubt that the defendant "directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy." In *United States v. Kostoff*, 585 F.2d 378 (9th Cir.1978), we discussed the quantum of proof required to show a defendant's knowing participation in a conspiracy:

> The government need not show direct contact or explicit agreement between the defendants. It is sufficient to show that each defendant knew *or had reason to know* of the scope of the conspiracy and that each defendant *had reason to believe* that [his] own benefits were dependent on the success of the entire venture.

*Id.* at 380 (emphasis added).

Appellants rely on our decision in *United States v. Aguilar*, 80 F.3d 329 (9th Cir.1996), to support their contention that the district court's instruction was erroneous. In *Aguilar*, actual knowledge was an essential element of the offense charged. *See id.* at 330. We held in *Aguilar* that a jury instruction which erroneously includes both a subjective and an objective standard of knowledge creates the possibility of a conviction without the requisite proof of guilt. *See id.* at 331.

Aguilar is inapposite where, as here, objective knowledge is sufficient to connect a defendant to a conspiracy already proven to exist. *See Arbelaez*, 719 F.2d at 1458–59 (holding that once the Government has established that a conspiracy exists, "[i]t is sufficient to show that each defendant knew or had reason to know of the scope of the conspiracy" to prove defendant's knowing participation) (internal citation omitted). The Government does not dispute that actual knowledge is required to prove the existence of a conspiracy. However, the language in Instruction 17 addressed the defendants' connection to the conspiracy, not the question of whether or not a conspiracy existed. There-

fore, inclusion of the objective knowledge standard in Instruction 17 was not error.

## IX

■ Montgomery and Buxton argue that reversal is compelled because the district court provided the jury with written transcripts of Blair's and Farley's trial testimony. The jury twice requested the district court to provide it with the transcripts. After careful deliberation, the district court assented to the jury's request, noting that the transcripts were heavily relied upon by both the defense and the prosecution during the trial.

■ We review a district court's decision to allow the jury to read transcripts in the jury room for abuse of discretion. *See United States v. Hernandez*, 27 F.3d 1403, 1408 (9th Cir.1994). The decision to allow the jury to read transcripts in the jury room is "dependent on the particular facts and circumstances of the case." *United States v. Binder*, 769 F.2d 595, 600 (9th Cir.1985).

We have previously acknowledged the possibility that allowing a jury to read the transcripts of a witness's testimony "may place undue emphasis on testimony considered a second time at such a late stage of the trial." *United States v. Sacco*, 869 F.2d 499, 501 (9th Cir.1989). In *United States v. Lujan*, 936 F.2d 406 (9th Cir.1991), however, we upheld a district court's decision to comply with the jury's request to provide it with the trial transcript. In *Lujan*, we commented favorably on an instruction given by the district court to prevent the jury from placing undue emphasis on the testimony. *See id.* at 411–12. The trial court in *Lujan* "cautioned the jury that the transcript would not serve as a substitute for their memory or assessment of witness credibility[,] ... admonished [the jury] to weigh all the evidence and not to use the transcript to focus on any portion of the trial ... [and] instructed the jury the transcript was not authoritative and the juror's memory should prevail." *Id.* at 412.

Here, the district court gave Supplemental Jury Instruction 1, which provided as follows:

> I want you to bear in mind that the testimony at trial is the evidence, not the transcripts. The transcript is not authorita-

tive. If you remember something different from what appears in the transcripts, your collective recollection is controlling. In other words, the transcripts may not serve as a substitute for the collective memories of the jury or take the place of the assessment of the credibility of witnesses subject to the usual rules.... Finally, as the court has previously instructed you, you must weigh all of the evidence in the case and not focus on any one portion of the trial.

Prior to making its decision, the district court, like the trial court in *Lujan,* provided counsel with the opportunity to note inaccuracies in the transcripts. The district court's decision to allow the transcripts into the jury room was not an abuse of discretion.

## X

Montgomery contends that he was prejudiced by the district court's statement in Instruction 16 that, as a matter of law, "the evidence is insufficient to convict defendant Lloyd Ray Buxton of conspiracy ... as charged in Count Three." Montgomery timely objected to the district court's proposed instruction. He now asserts that "[t]he trial court's comments ... impermissibly implied—vouched for the fact—that there was sufficient evidence against the remaining defendants." (Montgomery's Opening Br. at 51.) A district court's formulation of jury instructions is reviewed for abuse of discretion. *See United States v. De Cruz,* 82 F.3d 856, 864 (9th Cir.1996). In deciding whether the district court abused its discretion, we consider whether the instructions as a whole are misleading or inadequate to guide the jury's deliberations. *See United States v. Moore,* 109 F.3d 1456, 1465 (9th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 108, 139 L.Ed.2d 61 (1997).

We are inclined to agree with Montgomery that the district court's statement to the jury that the evidence against Buxton was insufficient would have resulted in prejudice if unaccompanied by a curative instruction. In *United States v. DeLucca,* 630 F.2d 294 (5th Cir.1980), the Fifth Circuit held:

[O]nce the fact of a codefendant's guilt or innocence is made known to the jury, it is

incumbent upon the trial judge to take appropriate corrective action in order to protect the remaining defendants' substantive rights. Immediate jury instructions are but one of the many curative methods at his disposal.

*Id.* at 299.

Here, the district court gave the jury the following admonition: "This disposition should not influence your verdict with reference to the remaining count against defendant Buxton or the remaining counts against defendants McClain and Montgomery. You must base your verdict solely on the evidence before you." We conclude that the court's instruction regarding the dismissal of Count Three against Buxton, when viewed as a whole, was not misleading or prejudicial.

## XI

Buxton argues that the district court improperly admitted evidence of his 1986 conviction for conspiracy to manufacture methamphetamine. Rule 404(b) of the Federal Rules of Evidence precludes the admission of evidence of "other crimes ... to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). Evidence of other crimes, however, is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* We review a district court's decision to admit evidence of other crimes for abuse of discretion. *See United States v. Arambula–Ruiz,* 987 F.2d 599, 602 (9th Cir.1993).

We have adopted a four-part test to determine the admissibility of evidence under Rule 404(b). *See United States v. Basinger,* 60 F.3d 1400, 1407–08 (9th Cir. 1995). First, the evidence of other crimes must tend to prove a material issue in the case. Second, the other crime must be similar to the offense charged. Third, proof of the other crime must be based on sufficient evidence. Fourth, commission of the other crime must not be too remote in time. *See id.* In addition to satisfying the four-part test, evidence of other crimes must also satisfy the Rule 403 balancing test—its probative

value must not be substantially outweighed by the danger of unfair prejudice. *See* Fed. R.Evid. 403. The Government has the burden of demonstrating that the evidence of other crimes satisfies these requirements. *See Arambula–Ruiz*, 987 F.2d at 602–03.

Buxton's argument focuses on the first and second prongs of the *Basinger* test. He contends that knowledge was not a material issue in this case. He also maintains that knowledge of methamphetamine manufacture is irrelevant to methamphetamine distribution. Buxton's first contention is without merit. In *United States v. Mayans*, 17 F.3d 1174 (9th Cir.1994), we held that knowledge and intent are material issues "simply because the government had to prove them." *Id.* at 1182. "To establish a drug conspiracy, the government must prove: (1) an agreement to accomplish an illegal objective; and (2) the intent to commit the underlying offense." *Iriarte–Ortega*, 113 F.3d at 1024. "Knowledge of the objective of the conspiracy is an essential element of any conspiracy conviction." *United States v. Krasovich*, 819 F.2d 253, 255 (9th Cir.1987). "[T]he fact that appellant's defense was non-participation does not render the issue of knowledge irrelevant." *Mayans*, 17 F.3d at 1182.

Buxton maintains that there is no logical nexus between the knowledge "gained" from manufacturing methamphetamine and the knowledge required for the distribution of methamphetamine. Prior acts, when offered to show knowledge, however, need not be similar to the charged act "as long as the prior act was one which would tend to make the existence of the defendant's knowledge more probable than it would be without the evidence." *United States v. Ramirez–Jiminez*, 967 F.2d 1321, 1326 (9th Cir. 1992) (internal quotation marks and citations omitted). A jury could properly infer from Buxton's prior conviction for conspiracy to manufacture methamphetamine that he was sufficiently familiar with the illicit production of methamphetamine so as to possess knowledge regarding its distribution. *See United States v. Otis*, 127 F.3d 829, 834 (9th Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1400, 140 L.Ed.2d 657 (1998) (No. 97–8207) (holding that in a money laundering case, evidence of defendants' prior drug convictions was admissible under Rule 404(b) to show knowledge that money was derived from cocaine sales where the prior convictions tended to show defendants' familiarity with the cocaine business).

The district court gave a limiting instruction regarding evidence of other crimes. The court instructed the jury as follows: "You have heard evidence that defendant Lloyd Ray Buxton has previously been convicted of conspiracy to manufacture methamphetamine. You may consider that evidence only as it bears on intent, knowledge, or lack of mistake and for no other purpose. You may not consider a prior conviction as evidence of guilt of the crime for which the defendant is now on trial." In *Arambula–Ruiz*, we explained that "an appropriate instruction limiting the purpose for which the jury could consider evidence of a defendant's prior conviction" is a factor weighing in favor of admission of Rule 404(b) evidence. 987 F.2d at 604. In light of the limiting instruction and the district court's careful application of Fed.R.Evid. 403 and 404, we conclude that it did not abuse its discretion in admitting evidence of Buxton's prior conviction.

## XII

Buxton contends that there was insufficient evidence in the record as a matter of law to support his conviction on Count Two—conspiracy to distribute methamphetamine. In reviewing the record for sufficiency of the evidence, we must determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *United States v. Lennick*, 18 F.3d 814, 820 (9th Cir.1994).

Buxton concedes that the evidence, viewed in the light most favorable to the prosecution, shows a conspiracy between Montgomery

and McClain. This concession is warranted by the record. The testimony of Helen Farley and Joanne Blair painted a picture for the jury of an organized distribution network for the methamphetamine produced in Canada. While Farley's testimony most clearly showed Buxton's involvement in the conspiracy, there was also a significant amount of circumstantial evidence implicating Buxton—the phone records, the slips of paper with Buxton's name and number found in Canada, and references to the "boys in Sacramento."

The jury was entitled to infer from the evidence in the record that Buxton was a co-conspirator, not merely an occasional buyer. In *United States v. Delgado*, 4 F.3d 780 (9th Cir.1993), we explained that certain conduct "may be sufficient to indicate the existence of more than a buyer-seller relationship ... including: arranging contacts and meetings ... and transaction in large quantities with regularity." *Id.* at 791. Farley's testimony thus provides a basis for the jury to find that Buxton was part of an agreement to distribute methamphetamine. The evidence was sufficient to sustain Buxton's conviction on Count Two.

### XIII

■■■■ Buxton argues that the district court's instructions inadequately explained that evidence of a mere buyer-seller relationship is insufficient to support a conspiracy conviction. A defendant is not entitled to have the jury instructed "in the particular language of his choice." *Brooks v. Cook*, 938 F.2d 1048, 1053 (9th Cir.1991). The court instructed the jury that "existence of a buyer-seller relationship does not prove the existence of a conspiracy to manufacture, distribute and/or import a controlled substance; the defendants must have reached an agreement or arrived at a plan to further the manufacture, distribution, and/or importation of a controlled substance." This instruction adequately explained to the jury the law regarding a buyer-seller relationship.

### Conclusion

We summarize our disposition of the issues raised in this appeal as follows:

We conclude that charging separate conspiracies under the same conspiracy statute does not violate the Double Jeopardy Clause where the alleged conspiracies are factually distinct. The identification procedures employed in this case with respect to one prosecution witness were suggestive and unnecessary under the circumstances confronting the investigators. Because the Government demonstrated that the witness's in-court identification was independently reliable, the admission of this evidence did not violate due process. The Government's failure to notify Montgomery's counsel prior to bringing that witness into court to confirm his identification before being called to testify did not deprive the accused of his right to counsel because the confrontation was not critical. Montgomery's counsel's cross-examination of the witness permitted the jury to weigh the impact of the suggestive procedure against the reliability of the witness's in-court identification. Based on the Supreme Court's construction of identical language in 21 U.S.C. § 846, we hold that the district court did not err in concluding that section 963 of Title 21 does not require proof of an overt act to sustain a judgment of conviction.

The district court did not err in its instruction to the jury regarding the level of knowledge required to connect a defendant to a pre-existing conspiracy. The district court's failure to offer a *Sears* instruction *sua sponte* was not plain error because Montgomery did not rely on a *Sears*-type defense theory at trial. The district court's *Pinkerton* instruction was neither misleading nor inadequate to guide the jury's deliberations on the issue of co-conspirator vicarious liability. The court's comment regarding the dismissal of Count Three against Buxton was not prejudicial in light of the contemporaneous curative instruction that was read to the jury. The district court properly instructed the jury that evidence of a mere buyer-seller relationship is insufficient to support a conviction for conspiracy to distribute methamphetamine.

The district court did not abuse its discretion in admitting evidence of Buxton's prior conviction for conspiracy to manufacture methamphetamine to prove his knowledge of

the objectives of the conspiracy to distribute methamphetamine alleged in the indictment.

There is sufficient evidence in the record to sustain the judgment of conviction against Buxton. The record also demonstrates that the district court properly exercised its discretion in providing the jury with transcripts of the testimony of two of the Government witnesses.

The judgment of conviction is AFFIRMED as to each appellant.